C. W. Stone, R. B. Stone, A. J. Hazeltine and J. B. Akin *v.* the Marshall Oil Company, the Washington Oil Company and the Taylorstown Natural Gas Company. Appeals of the Washington Oil Company and the Taylorstown Natural Gas Company.

*Lease—Oil and gas lease—Forfeiture—Covenants—Covenants running with land.*

When a covenant is for the performance of some duty in connection with the possession of land, and relating thereto, or in the nature of rent or royalty for the use and enjoyment of the premises, it is a covenant running with the land. The rent need not be money; it may be a share in the product, as the share of oil in an oil lease or the share of the proceeds of the sale of gas in a gas lease.

Where an owner of land executes an oil and gas lease, and, subsequently, after a default in the payment of rental, but without any declaration of forfeiture, executes a second lease to other parties, in which it is expressly provided that such parties should stand between him, "and all who may have claims to this lease," the execution of the second lease is not a declaration of forfeiture of the first lease.

G., the owner of 150 acres of land, executed an oil and gas lease to A. in consideration of one eighth of the oil and a certain sum per annum for gas if discovered, with a stipulation that failure to pay rentals would

render the lease void. Subsequently A. & Co. composed of A. and the persons to whom he had assigned one half of the lease, executed two leases of portions of the land to M., an oil company. In these leases it was provided that M. should drill an additional well, and that A. & Co. should receive one fourth of the profits of the gas, if any were discovered. In 1888 M. drilled a well on the land which proved to be a very valuable gas well. About a month after this well was drilled, G., who had never declared a forfeiture of his lease to A., although there had been a failure to pay rental, executed an oil and gas lease on the whole 150 acres to M., which did not require the drilling of the additional well. In this lease M. agreed to stand between G. " and all who may have claims to this lease." About one month after the execution of the latter lease, M. sold and leased the gas well and fifteen acres surrounding it to W., an oil company. About a year afterwards W., not being able under its charter to conduct the gas business, sold the well to a natural gas company which it had organized, and most of the stock of which it held. W. knew before it leased from M. that M. had drilled and completed a well on this property under a lease with plaintiffs. The lease from G. to A. was recorded. In 1893 a bill in equity was filed by A. &. Co. against M., W. and the gas company for discovery, to ascertain the facts as to the relations of the different defendants to the gas leases, the disposal of the gas, and for an account of the profits of the gas well. *Held,* (1) that equity had jurisdiction of bill; (2) that plaintiffs were not guilty of laches; (3) that the statute of limitations did not apply; (4) that the execution of the second lease by G. was not a forfeiture of his first lease; (5) that M. in procuring the second lease from G. acted in bad faith and was guilty of legal fraud upon the plaintiffs; (6) that W. was not an innocent purchaser or lessee; (7) that W. was a sublessee under the plaintiffs' lease; (8) that the sale of the gas by W. to the gas company was virtually a sale of the well and a part of the leasehold realty; (9) that the gas company was a sub-sublessee of the lease from the plaintiffs to M., and as such subject to all the covenants in said lease; (10) that the covenants in plaintiffs' lease to M. ran with the land; (11) that the plaintiffs were entitled to an account from all three of defendant companies of the profits realized from the sale of the gas.

Argued Nov. 2, 1898. Appeals, Nos. 60 and 61, Oct. T., 1898, by the Washington Oil Company and Taylorstown Nat. Gas Co., from decree of C. P. No. 2, Allegheny Co., Oct. T., 1893, No. 132, on bill in equity. Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an account.

The facts appear by the opinion of WHITE, P. J., which was as follows:

### FINDINGS OF FACT.

1. On November 13, 1885, John Grimes gave an oil and gas lease to J. B. Akin, his executors, administrators and assigns, of 150 acres of land in Washington county, "for the sole and only purpose of drilling and operating for petroleum oil or gas, for the term of three years, or as long thereafter as oil or gas is found in paying quantities." Akin was to give one eighth of the oil and pay "seven hundred dollars per annum for the gas from each and every well drilled on the premises, in case the gas is conducted and used off the premises." Akin was to complete one well within a year from the date of the lease; he was to pay Grimes "one hundred and fifty dollars per annum, commencing six months after this date," payable quarterly, and Grimes agreed to accept that sum "as full consideration and payment for each yearly delay, until one well shall be completed;" and a failure to complete one well, or to make any of said payments within such time, rendered the lease null and void. The lease was acknowledged by Grimes on December 3, 1885, and was recorded in Washington county, July 22, 1886.

2. Akin sold and assigned a one half interest in the lease to R. B. Stone, A. J. Hazeltine and C. W. Stone, on December 2, 1886, which was acknowledged the same day and recorded the same day, in Washington county. Akin & Company drilled no well, but paid the quarterly instalments. On August 19, 1887, they executed a lease to the Marshall Oil Company, of fifty acres of the farm, reciting the lease from Grimes to Akin and its provisions. The lease was "for the sole and only purpose of drilling and operating for petroleum oil or gas for the period of one year, and as long thereafter, less than the term of said original lease, as oil or gas may be found in paying quantities, subject, however, to all the reservations, stipulations, rents and covenants in said original lease contained, all of which are to be faithfully kept and performed by the said party of the second part (the Marshall Oil Company), its successors and assigns." The Marshall Oil Company agreed to drill four wells; one to be completed within four months, one in eight months, one in twelve months, and one in sixteen months.

There was this further provision, which is the foundation

of this suit: " In further consideration of the lease hereby granted, the said parties of the second part (the Marshall Oil Company), for itself, its successors and assigns, agrees to give to said parties of the first part (the plaintiffs) their executors, administrators and assigns, one-fourth of all petroleum produced from said premises ; " one eighth to the credit of John Grimes, the original lessor, and one eighth to the lessors of this lease, " it is also agreed that in case gas shall be discovered and conducted off the premises for use or sale, the said parties of the first part, in the proportionate interests aforesaid, shall receive one-fourth of the profits thereof above cost and bonus of seven hundred dollars to the original lessor." This lease was acknowledged on August 19, 1887, and recorded in Washington county on August 20, 1887.

3. On December 25, 1887, Akin & Company made a supplemental lease to the Marshall Oil Company of thirty acres more of the Grimes farm, on the same terms, stipulations and conditions as the lease of the fifty acres, reciting it, and providing that, in place of the four wells, none of which had been drilled, two wells should be drilled, one on the fifty acre tract and one on the thirty acre tract, and that one well should be completed within four months, " and as to all wells that may be drilled on either portion of said premises, the royalty of oil and gas shall be as fixed by the lease," of the fifty acre tract.

4. The Marshall Oil Company then proceeded to drill a well, which was completed on May 8, 1888, the only well ever drilled on the Grimes farm. It was drilled down to the oil rock, but produced no oil. It was a strong gas well. The Marshall Oil Company did not attempt to utilize the gas, but, for a month or so, endeavored to sell the well. After some delay and negotiations, they sold it to the Washington Oil Company, in connection with a lease for fifteen acres, for $4,000.

5. While these negotiations were going on, and while the well was being gauged, to ascertain the pressure of the gas, the Marshall Oil Company obtained a lease of John Grimes for the whole farm, dated June 19, 1888. This lease was nearly indentical with the lease from Grimes to Akin, except that $600, instead of $700 per annum should be paid for every gas well, when the gas should be conducted and used off the premises, and for the gas well then completed $700 per annum

should be paid, and there was no requirement in this lease to put down any additional well. This lease was acknowledged by Grimes on July 4, 1888. Grimes, by a separate agreement, agreed to reduce the annual rental of the gas well to $500. The Marshall Oil Company, then, by sale and lease dated July 5, 1888, sold the well and leased fifteen acres to the Washington Oil Company, in consideration of $4,000 cash paid, and subject to all the terms and conditions of the lease of June 19, 1888.

6. The Washington Oil Company tubed the well and conducted the gas off the premises for sale or use, from August, 1888, to September 2, 1889, and then sold the gas to the Taylorstown Natural Gas Company, by bill of sale dated September 2, 1889; and that company has been conducting the gas off the premises and selling it ever since.

7. The rent due to Grimes on his lease to Akin was paid promptly until February 13, 1888. The rent for the quarter ending May 13, 1888, was not paid.

8. Grimes never declared a forfeiture of his lease to Akin of November 13, 1885. When he made the lease to the Marshall Oil Company of June 15, 1888, he required a statement to be inserted in the lease, before he would sign it, as follows: "The party of the second part (The Marshall Oil Company) agrees to stand between the party of the first part (himself) and all who may have claims to this lease." After the lease was signed he said to Mr. Akin that he signed it because he wanted to get all the money out of the farm he could; that he didn't know whether his lease was good or not, but the Marshall Oil Company had agreed to stand between him and harm.

9. The Taylorstown Natural Gas Company was simply a device of the Washington Oil Company to get certain privileges and advantages which it could not get under its charter. It wanted the power to secure the right of way for laying pipes and conducting gas to distant points and selling it, which it could not do under its charter as an oil company. The large majority of the stock of the Taylorstown Natural Gas Company is owned by the Washington Oil Company, the officers of the two companies are nearly the same, the Washington Oil Company has the entire management and control of the business and receives all, or nearly all the profits. The paper of September 2, 1889, although called a bill of sale, is virtually a lease.

No cash or hand money was paid.   It sells the gas of the well for twenty years, if it shall so long pay to pipe it, the Taylorstown Natural Gas Company to pay the annual royalty to Grimes and $400 a year to the Washington Oil Company.

10.  When the drilling ceased, May 8, 1888, the flow of gas indicated a strong gas well.   Several tests were made to ascertain the pressure, and each test showed an increased pressure and indicated a very strong gas well.   By July 4, when the Marshall Oil Company sold to the Washington Oil Company, it was known to be a remarkably strong gas well—a wonderful gas well, as some of the witnesses described it.   It has produced an immense volume of gas, sufficient to supply the boilers for drilling forty or fifty wells at the same time, and still continues, after nine years, to produce gas, with little or no diminution of force or volume.

11.  After the gas well was completed, May 8, 1888, by the Marshall Oil Company, the plaintiffs did nothing under the Grimes lease to Akin, and, although they knew of the Grimes lease to the Marshall Oil Company, of June 19, 1888, they took no legal steps to test that lease, and made no demand of any of the defendant companies for a share of the profits of the gas, until about the time this bill was filed, July 25, 1893, five years after the Marshall Oil Company had sold to the Washington Oil Company.

### CONCLUSIONS OF LAW.

1.  Is this a proper case for a court of equity?   The bill was filed for discovery, to ascertain the facts as to the relations of the different defendants to the question at issue; as to the disposal of the gas from the well, and for an account for plaintiffs' share of the profits from the sale of the gas.   These matters bring the case properly within the jurisdiction of a court of equity.

2.  It is claimed that the plaintiffs were guilty of such laches that they cannot maintain this bill.   The statute of limitations cannot apply, for the delay in bringing suit is less than six years from the time the well was completed.   It was only five years from the sale by the Marshall Oil Company to the Washington Oil Company, and less than four years from the sale to the Taylorstown Natural Gas Company.   In the mean time, the

plaintiffs said or did nothing to mislead the defendant companies. They all had actual, as well as constructive, notice of the lease from plaintiffs to the Marshall Oil Company. None of them inquired of the plaintiffs whether they had abandoned their lease or contended that it was still binding. The Marshall Oil Company had a right to make a sale or lease to the Washington Oil Company, and that company to the Taylorstown Natural Gas Company, without the consent of plaintiffs, subject, of course, to the terms of the lease of plaintiffs to the Marshall Oil Company, if that lease was still valid. The silence of the plaintiffs, therefore, was immaterial. If that lease was still valid, they would have to account for a share of the profits from the sale of gas. Besides, there was a continuous liability, from year to year.

3. The main ground of defense is that the lease from Grimes to Akin was forfeited. If that is true, the plaintiffs have no case. Grimes had a right to forfeit the lease for nonpayment of the quarterly instalment of rent, but it is admitted that the rent was paid until February 13, 1888, and the next quarter would not be due until May 13, 1888. The well was completed May 8, 1888. After the lease from plaintiffs, the Marshall Oil Company was liable to pay the rent. Of course, if neither party paid Grimes he could forfeit the lease. Did he do so? Mr. Hart, a member of the Marshall Oil Company, testified that when Grimes visited the well, on May 7 or 8, while they were finishing the drilling, and discovered it was a gas well, Grimes said to him, " The lease is forfeited for nonpayment of rent." Grimes denies this, but Grimes could not forfeit the lease then as no rent was due or would be due until May 13. But it is contended that the lease of Grimes to the Marshall Oil Company of June 19, 1888, was a declaration of forfeiture. That would be true if the lease was made for that purpose, and, ordinarily, there would be that presumption. A clause in that lease, inserted at the request of Grimes before he would sign it, proves that he did not intend that lease as a forfeiture of the prior lease to Akin. It was expressly provided that the Marshall Oil Company should stand between him and " all who may have claims to this lease." That means, all who might have claims to the leased premises under a former lease. This clause proves two things : first, it was not an act on the

part of Grimes intended to declare a forfeiture, and second, that the Marshall Oil Company knew that fact and took that lease with full knowledge that there might be a contest, and voluntarily assumed the risk.

4. It is very evident that the Marshall Oil Company in procuring the lease from Grimes of June 19 acted in bad faith, and was guilty of a legal fraud upon the plaintiffs. They were bound under the plaintiffs' lease to drill another well and pay one fourth of the profits from the sale of gas. They were negotiating with the Washington Oil Company to buy the property. They procured this lease from Grimes for two purposes; first, to get clear of drilling another well, which they were bound to do under the lease from the plaintiffs, and there is nothing in their lease from Grimes requiring them to drill another well; and second, to get clear of paying the one fourth of the profits of the sale of the gas, as there is nothing of that kind in their Grimes lease.

5. The Washington Oil Company is not an innocent purchaser or lessee. They knew that the Marshall Oil Company had drilled the well under a contract and lease from the plaintiffs; that it was completed more than a month before the Grimes lease of June 19; they knew, or they were bound to know, because that lease was on record, all the terms and conditions of that lease. The clause in the Marshall Oil Company's Grimes lease that that company should stand between Grimes and all persons claiming an interest in the lease, was plain warning that the lease might be contested, and yet, notwithstanding that knowledge and that plain warning, they did not inquire of Grimes or the plaintiffs whether their lease was forfeited, or claimed to be valid. With their eyes open they bought this well and took a lease of fifteen acres from the Marshall Oil Company, knowing, as they must have known, that, in procuring that lease from Grimes, the Marshall Oil Company was guilty of bad faith, if not manifest fraud, towards the plaintiffs.

6. If the Grimes lease to the Marshall Oil Company was a fraud upon plaintiffs' rights under the Grimes lease to Akin it has no validity. The Marshall Oil Company could convey by virtue of it no title or rights to the Washington Oil Company. The title and rights conveyed to the Washington Oil Company must, therefore, be under the lease from the plaintiffs; and the

Washington Oil Company would be a sublessee under the plaintiffs' lease.

7. The sale of the gas by the Washington Oil Company to the Taylorstown Natural Gas Company is virtually a sale of the well and a part of the leasehold realty. The Taylorstown Natural Gas Company took possession of the well, and has retained possession ever since. The Washington Oil Company had nothing whatever to do about the well or delivering the gas. The parties cannot change or disguise the real transaction by calling it a bill of sale. Courts, especially courts of equity, will always look through and underneath technical terms to get at the real transaction, and call it by its proper name. The Taylorstown Natural Gas Company is a purchaser or lessee of the well, which, of course, includes the gas flowing from it, and this company is in exclusive possession and enjoyment of the part of the leasehold realty, in the lease from the plaintiffs to the Marshall Oil Company. It is a sub-sublease, and as such subject to all the covenants in the original lease.

8. If the foregoing views are correct, there can be but little difficulty on the question whether the covenants in the plaintiffs' lease to the Marshall Oil Company run with the land. In general terms it may be said that when a covenant is for the performance of some duty in connection with the possession, and relating to the land, or in the nature of rent or royalty for the use and enjoyment of the premises, it is a covenant running with the land: Kerr on Real Property, secs. 1218 to 1222; 1 Washburn on Real Property (5th ed.), 528; 2 Washburn on Real Property, 298; 1 Smith's Leading Cases, 230, 231.

The rent need not be money; it may be a share in the product, as a share of the crops on a farm or the share of oil in an oil lease: Fennell v. Guffey, 139 Pa. 341; 155 Pa. 38; Landell v. Hamilton, 175 Pa. 327.

A share of the gas stands on the same footing as a share of the oil. A share of the oil may be delivered at the well or in pipe lines; as a share of the gas could not be delivered in specie at the well or elsewhere, the only way of sharing it would be to share in the proceeds of sale.

9. The plaintiffs are entitled to an account from the defendant companies of the profits realized from the sale of the gas. To ascertain the profits all expenses of every kind must first

be deducted from the proceeds of the sale. If the gas was used by the Washington Oil Company or the Taylorstown Natural Gas Company in drilling wells of their own, or otherwise using the gas in their own business, they should be charged for that at the same rates as though sold to others or what it was really worth. The expenses include $700 rental to Grimes under the original lease, costs of pipe and other materials in keeping up the lines, payments for right of way, payments to all employees engaged in attending to the well, pipes, etc., and the business generally of saving, transporting and selling the gas. Although Grimes reduced the annual rental to $500, that was a special favor to defendants, of which the plaintiffs cannot claim any benefit. Their lease with Grimes required them to pay $700 annually.

A master will be appointed to take testimony and state an account against the Washington Oil Company and the Taylorstown Natural Gas Company. On his report coming in the court will consider the liability of the Marshall Oil Company and any other questions that may properly arise. If the parties can agree within twenty days upon a master, he will be appointed; if not, the court will appoint.

The court subsequently entered the following decree:

This cause came on to be heard upon the issues framed and proofs offered in support thereof, by both plaintiffs and defendants, and upon argument of counsel, after due consideration thereof, and of said issues and proofs, an opinion was filed on January 15, 1898, wherein the findings of fact and law by the court were specifically stated, and in pursuance thereof, now, February 1, 1898, it is ordered, adjudged and decreed that the plaintiffs are entitled to an account from the defendant companies of the profits realized from the sale of the gas from the well on the Grimes farm described in the bill of complaint in this case, and that to ascertain the profits, all expenses of every kind must first be deducted from the proceeds of the sale of said gas; and that if the gas was used by the Washington Oil Company or the Taylorstown Natural Gas Company in drilling wells of their own, or the gas was otherwise used in their own business, they should be charged for said gas, at the same rates as though sold to others, or at what said gas was really worth: the expenses to include seven hundred dollars ($700)

annual rental to Grimes under the original lease, the costs of
pipes and other materials in keeping up the well, payments for
rights of way, payments to all employees engaged in attending
to the wells, pipes, etc., and the business, generally, of saving,
transporting and selling the gas, and that J. C. Gray be ap-
pointed master to take testimony, and state an account against
the Washington Oil Company and the Taylorstown Natural
Gas Company, and that upon his report coming in the court
will consider the liability of the Marshall Oil Company, and
any other questions that may properly arise.

*Error assigned* was the decree of the court.

*Edward McSweeney*, with him *R. W. Cummins*, for appel-
lants.—The transfer of covenants real which run with the land
form an exception to the general rule of the common law, that
contracts and covenants being choses in action cannot be as-
signed: 2 Chitty on Contracts, p. 1382 ; 1 Smith's Leading Cases,
Notes to Spencer's Case, p. 176.

One cannot be charged as assignee and held liable to fulfil
covenants, unless he has taken a valid assignment of the estate
to which the covenants are annexed, and when his occupancy
is that of a mere sublessee, or is merely permissive by the
lessee, no privity of estate arises between him and the lessor.
To be an assignee he must come in by assignment of the estate
demised by the original lessor: 2 Chitty on Contracts (11th
American ed.), page 1394 ; Davis v. Morris, 36 N. Y. 569 ;
Fulton v. Stuart, 2 Ohio, 216 ; St. Clair v. Williams, 7 Ohio,
396 ; Beach v. Adams, 1 Phila. 99 ; Taylor on Landlord and
Tenant, sec. 429 ; Hannen v. Ewalt, 18 Pa. 9 ; Thomas v. Con-
nell, 5 Pa. 13 ; Wickersham v. Irwin, 14 Pa. 108 ; Quacken-
boss v. Clarke, 12 Wendell, 555 ; Welsh v. Scuyler, 6 Daly
(N. Y. 1876), p. 412 ; 1 Washburn on Real Property, 516,
sec. 5.

Plaintiffs are not entitled to an account against the Washing-
ton Oil Company nor against the Taylorstown Natural Gas
Company, because no trust relation cognizable in any court of
equity is charged or appears against these companies: Bis-
pham's Equity, sec. 217 ; 1 Washburn on Real Property, 516.

The covenant contained in the lease in reference to giving

the plaintiffs one fourth derived from the use and sale of gas is merely personal in its nature, and not binding on assignees of the Marshall Oil Company under that lease; a fortiori, it cannot be binding on assignees claiming under a distinct title not derived under that lease: Jones v. Davidson, 2 Sneed (Tenn.), 452; Connolly v. Davidson, 15 Minnesota, 519; 2 Blackstone's Com. *41.

The plaintiffs have a full, complete and adequate remedy at law, either to protect their title or to enforce the covenants contained in their lease: Pomeroy's Eq. Juris. sec. 177; Bispham's Principles of Equity (5th ed.), p. 369; Spangelberger v. Leger, 2 Kulp, 29; Bentley v. Kenyon, 2 Luz. Leg. Obs. 316.

*A. Leo Weil* and *Charles M. Thorp*, for appellees, were not heard, but argued in their printed brief: The covenant ran with the land: 2 Kerr on Real Property, sec. 1220; 1 Washburn on Real Property (5th ed.), 528; 1 Smith's Leading Cases, 176; Masury v. Southworth, 9 Ohio, 340; Fennell v. Guffey, 139 Pa. 341; Williams v. Short, 155 Pa. 480; Washington Natural Gas Co. v. Johnson, 123 Pa. 576; Streaper v. Fisher, 1 Rawle, 161; Herbaugh v. Zentmyer, 2 Rawle, 159; Negley v. Morgan, 46 Pa. 281; Patten v. Deshon, 67 Mass. 325; Twynam v. Pickard, 2 Barnewall & Alderson, 105.

The Washington Oil Company and the Taylorstown Natural Gas Company, while they were respectively in the possession of said premises, were in privity of estate with plaintiffs: 1 Washburn on Real Property, 542; Taylor on Landlord and Tenant, sec. 426; McKelvey v. Truby, 4 W. &. S. 323; Knouff v. Thompson, 16 Pa. 357; Willis v. Swartz, 28 Pa. 413; Millingar v. Sorg, 55 Pa. 215; Miller v. Miller, 60 Pa. 16; Woodward v. Tudor, 81* Pa. 383; Miller's App., 84 Pa. 391; Horn v. Miller, 136 Pa. 640.

Plaintiffs were not guilty of laches: Adams's App., 113 Pa. 449; Mosgrove v. Golden, 101 Pa. 613; Foster v. Jack, 4 Watts, 334; Lichty v. Hugus, 55 Pa. 434; Malone v. Haman, 5 W. N. C. 447; Wilhelm's App., 79 Pa. 141.

PER CURIAM, November 14, 1898:

The decree in this case is affirmed on the opinion of the learned court below.